## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**VICKIE McKENNA**                                          CIVIL ACTION NO.:
    **Plaintiff**

**v.**

**AMERICAN MEDICAL SYSTEMS, INC.,**
**C.R. BARD, INC., BOSTON SCIENTIFIC CORP.,**
**ETHICON, INC., COLOPLAST CORP.,**
**COOK MEDICAL INC, and NEOMEDIC**
    **Defendants**

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Vickie McKenna by and through her attorneys, Bachus and Schanker, LLC, brings this Complaint and Jury Demand against Defendants American Medical Systems, Inc., C.R. Bard, Inc., Boston Scientific Corp., Ethicon, Inc., Coloplast Corp., Cook Medical, Inc. and Neomedic ("Defendants") and alleges the following based upon personal knowledge, information and belief and investigation of counsel.

## <u>NATURE OF ACTION</u>

1.      This action seeks to recover damages for injuries sustained by Plaintiff Vickie McKenna ("Plaintiff") as the direct and proximate result of the wrongful conduct of defendants in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting and selling of transvaginal mesh.

<u>**PARTIES, JURISDICTION & VENUE**</u>

**PLAINTIFF**

2.      Plaintiff is and was at all relevant times an adult resident of the state of Colorado and had transvaginal mesh implanted to treat her stress urinary incontinence.  Plaintiff has suffered damages as a result of Defendants' illegal and wrongful conduct alleged herein.

**DEFENDANTS**

3.      American Medical Systems, Inc. ("AMS") is a wholly owned subsidiary of defendant American Medical Systems Holdings Inc., Defendant AMS is a wholly owned subsidiary of defendant Endo Pharmaceuticals, Inc., Endo Pharmaceuticals Holdings Inc. and Endo Health Solutions Inc. and is a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801.

4.      Defendant American Medical Systems, Holdings Inc., ("AMS HOLDINGS") is a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801 and is the parent of wholly-owned subsidiary AMS.

5.      Defendant Endo Pharmaceuticals, Inc. (ENDO) is a Pennsylvania corporation, with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania. 19317.

6.      Defendant Endo Pharmaceuticals Holdings, Inc. (ENDO HOLDINGS) was a Delaware corporation with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317. ENDO HOLDINGS was the parent of wholly-owned subsidiary, ENDO. On May 23, 2012, ENDO HOLDINGS changed its name to Endo Health Solutions, Inc.

6.      Defendant Endo Health Solutions Inc. (ENDO HEALTH SOLUTIONS) is a Delaware

corporation with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317. and is the parent of AMS and AMS HOLDINGS.

7.     Defendant ENDO HEALTH SOLUTIONS has aggregated four operating businesses into one enterprise including AMS and AMS HOLDINGS.

8.     At all relevant times, defendant ENDO merged with AMS and as part of that acquisition, purchased and assumed all liability relating to legal claims arising from the implantation of defective synthetic pelvic mesh systems. ENDO and AMS shall be referred to hereinafter collectively as "Defendants."

9.     At all times material to this action, Defendants have designed, patented, manufactured, labeled, marketed, and sold and distributed a line of pelvic mesh products. These products were designed primarily for the purposes of treating stress urinary incontinence and pelvic organ prolapse. These products share common design elements and common defects. Moreover, each of these products was cleared for sale in the U.S. after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

10.     The products known as Apogee, Perigee, Mini-Arc Sling, Monarc Subfascial Hammock, Sparc, Bio-Arc, In-Fast Ultra, Influence In-Fast, and Elevate as well as any variations of these products and any unnamed AMS pelvic mesh products designed and sold for similar purposes, inclusive of the instruments and procedures for implantation and the pelvic mesh products designed and sold for similar purposes by the defendants listed below, are collectively referenced herein as "Defendants' Pelvic Mesh Products" or "the Products."

11.     C.R. Bard, Inc. ("Bard") is a New Jersey corporation with its principal place of business in New Jersey. All acts and omissions of Bard as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

12.     Sofradim Production SAS ("Sofradim") is a French company with its principal place of business at 116 Avenue Du Formans, Trevoux, France 01600. All acts and omissions of Sofradim as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

13.     Tissue Science Laboratories Limited ("TSL") is a British private limited company with its principal place of business in the United Kingdom. All acts and omissions of TSL as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

Collectively, Bard, Sofradim and TSL are herein referenced as the Bard Defendants.

The Bard Defendants' Pelvic Mesh Products are as follows:

a. The Align Urethral Support System;

b. The Align TO Urethral Support System;

c. The Avaulta Anterior BioSynthetic Support System;

d. The Avaulta Posterior BioSynthetic Support System;

e. The Avaulta Plus Anterior BioSynthetic Support System;

f. The Avaulta Plus Posterior BioSynthetic Support System;

g. The Avaulta Solo Anterior Synthetic Support System;

h. The Avaulta Solo Posterior Synthetic Support System;

i. The InnerLace BioUrethral Support System;

j. The Pelvicol Acellular Collagen Matrix;

k. The PelviLace BioUrethral Support System;

l. The PelviLace TO Trans-obturator BioUrethral Support System;

m. The PelviSoft Acellular Collagen BioMesh;

n. The Pelvitex Polypropylene Mesh;

o. The Uretex SUP Pubourethral Sling;

p. The Uretex TO Trans-obturator Urethral Support System;

q. The Uretex TO2 Trans-obturator Urethral Support System; and

r. The Uretex TO3 Trans-obturator Urethral Support System.

14.    Bard designed, manufactured, packaged, labeled, marketed, sold, and distributed the Align and Align TO Urethral Support Systems, including that which was implanted in Plaintiff.

15.    Sofradim designed, manufactured, packaged and labeled the Avaulta Anterior and Posterior BioSynthetic Support Systems, including that which was implanted in any Plaintiff so indicating in a Short Form Complaint. Bard marketed, sold, and distributed the Avaulta Anterior and Posterior BioSynthetic Support Systems, including that which was implanted in Plaintiff.

16.    Bard designed, manufactured, packaged, labeled, marketed, sold, and distributed the Avaulta Plus Anterior and Posterior BioSynthetic Support Systems, including that which was implanted in Plaintiff.  Bard designed, manufactured, packaged, labeled, marketed, sold, and distributed the Avaulta Solo Anterior and Posterior BioSynthetic Support Systems, including that which was implanted in Plaintiff.

17.    TSL designed, manufactured, packaged and labeled the InnerLace BioUrethral Support System, including that which was implanted in any Plaintiff so indicating in a Short Form

Complaint. Bard marketed, sold, and distributed the InnerLace BioUrethral Support System, including that which was implanted in Plaintiff.

18.    TSL designed, manufactured, packaged and labeled the Pelvicol Acellular Collagen Matrix, including that which was implanted in Plaintiff. Bard marketed, sold, and distributed the Pelvicol Acellular Collagen Matrix, including that which was implanted in Plaintiff.

19.    TSL designed, manufactured, packaged and labeled the PelviLace and PelviLace TO Trans-obturator BioUrethral Support Systems, including that which was implanted in Plaintiff. Bard marketed, sold, and distributed the PelviLace and PelviLace TO Trans-obturator BioUrethral Support Systems, including that which was implanted in Plaintiff.

20.    TSL designed, manufactured, packaged and labeled the PelviSoft Acellular CollagenBioMesh, including that which was implanted in Plaintiff.  Bard marketed, sold, and distributed the PelviSoft Acellular Collagen BioMesh, including that which was implanted in Plaintiff.

21.    Sofradim designed, manufactured, packaged and labeled the Pelvitex Polypropylene Mesh, including that which was implanted in Plaintiff.  Bard marketed, sold and distributed the Pelvitex Polypropylene Mesh, including that which was implanted in Plaintiff.

21.    Sofradim designed, manufactured, packaged and labeled the Uretex SUP Pubourethral Sling, and Uretex TO, TO2, and TO3 Trans-obturator Urethral Support Systems, including that which was implanted in Plaintiff. Bard marketed, sold and distributed the Uretex SUP Pubourethral Sling, and Uretex TO, TO2, and TO3 Transobturator.  Urethral Support Systems, including that which was implanted in Plaintiff.

22.    Boston Scientific is a Delaware corporation with its corporate headquarters in Massachusetts. All acts and omissions of Boston Scientific as described herein were done by its

agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

23.    Defendant Boston Scientific's Pelvic Mesh Products include, at least, the following:

a) The Uphold Vaginal Support System;

b) The Pinnacle Pelvic Floor Repair Kit;

c) The Advantage Transvaginal Mid-Urethral Sling System;

d) The Advantage Fit System;

e) The Lynx Suprapubic Mid-Urethral Sling System;

f) The Obtryx Transobturator Mid-Urethral Sling System;

g) The Prefyx PPS System; and

h) The Solyx SIS System.

24.    Boston Scientific designed, manufactured, packaged, labeled, marketed, sold, and distributed the following Pelvic Mesh Products, including that which was implanted in Plaintiff : Pinnacle Pelvic Floor Repair Kit, Uphold Vaginal Support System, Advantage Transvaginal Mid-Urethral Sling System, Advantage Fit, System, Lynx Suprapubic Mid-Urethral Sling System, Obtryx Transobturator Mid-Urethral Sling System, Prefyx PPS System, Solyx SIS System, and/or Other.

25.    Defendant Coloplast Corp. ("Coloplast Corp.") is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411. Coloplast Corp. is a wholly owned U.S. sales and marketing subsidiary of Coloplast A/S, a Denmark corporation.

26.    Defendant Mentor Worldwide LLC ("Mentor Worldwide") is, a limited liability corporation, incorporated in Delaware with an address of 1209 Orange Street, Wilmington, DE

19801, with a principal place of business at 5425 Hollister Avenue, Santa Barbara, CA 93111. The citizenship of a limited liability company (LLC) is determined by the citizenship of each of its members for purposes of diversity. *See, e.g., Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010). Mentor Worldwide's sole member is Ethicon, Inc. Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson located in Somerville, New Jersey.

27.     Defendant Coloplast A/S is a corporation organized and existing under the laws of the Kingdom of Denmark maintaining its principal place of business at Holtedam 1, Humlebaek 3050, Kingdom of Denmark.

28.     Defendant Coloplast Manufacturing US, LLC is a limited liability corporation organized and existing under Delaware, law maintaining its principal place of business as 1940 Commerce Drive, North Mankato, MN 56002. Its registered office is 560 Park Street, #6, St. Paul, Minnesota 55103. Coloplast Manufacturing US, LLC is a wholly-owned subsidiary of Coloplast Corp.

29.     Defendant Porges S.A. ("Porges") is a corporation organized and existing under the laws of the France maintaining its principal place of business at Centre d'affaires La Boursidière 92357 Le Plessis-Robinson cdx., France. Porges is a wholly owned subsidiary of Coloplast A/S.

30.     Coloplast Corp., Coloplast A/S, Coloplast Coloplast Corp., Coloplast A/S, Coloplast Manufacturing US, LLC, and Porges are collectively referred to herein as "Coloplast."

31.     At all times material to this action, Coloplast has designed, patented, manufactured, packaged, labeled, marketed, sold, and distributed a line of pelvic mesh products, which are delineated below. These products were designed primarily for the purposes of treating stress urinary incontinence and pelvic organ prolapse. Each of these products was cleared for sale in the United States after Coloplast made assertions to the Food and Drug Administration of

"Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy. One or more of Coloplast's pelvic mesh products were implanted in Plaintiff.

32.     The products include those known as T-Sling-Universal Polypropylene Sling, Aris-Transobturator Sling System, Supris-Suprapubic Sling System, Novasilk-Synthetic Flat Mesh, Exair-Prolapse Repair System, Restorelle, Smartmesh, Omnisure, and Minitape as well as any variations of these products and any unnamed Coloplast pelvic mesh product designed and sold for similar purposes, inclusive of the instruments and procedures for implementation. In addition, Coloplast manufactures, distributes, and sells products made of biologic materials known as Suspend-Tutoplast Processed Fascia Lata and Axis-Tutoplast Processed Dermis as well as any variations of these products and any unnamed Coloplast Pelvic Mesh Product designed and sold for similar purposes, inclusive of the instruments and procedures for implementation.

33.     Defendant, Cook Incorporated is a corporation organized under the laws of Indiana, with a principal place of business at 750 Daniels Way, P. O. Box 489, Bloomington, Indiana 47402. Defendant Cook Incorporated alleges as follows: it is also on the forefront of developing next generation technologies that advance combination drug/device and

biologic/device design concepts.

34.     All acts and omissions of Cook Incorporated, as described herein were done by its agents, servants, employees, and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership. At all times material hereto, Cook Incorporated did business in all states of the United States of America.

35.     Defendant, Cook Biotech Incorporated, is a corporation organized under the laws of Indiana, with a principal place of business at 1425 Innovation Place, West Lafayette, Indiana

47906. Defendant, Cook Biotech alleges as follows: it was created to develop and manufacture biomaterials from natural tissue sources for use in medical products. The company conducts research, development, and manufacturing operations in a state-of-the-art facility. Cook Biotech operates its own processing and production line where natural tissues are transformed into acellular biomaterials. In cooperation with university researchers, Cook Biotech has developed a line of products that can remodel native tissues using a biomaterial made from porcine small intestinal submucosa (SIS). Several FDA-cleared products using this technology to dress wounds or to surgically repair soft tissues are currently available from Cook and its distributors. Numerous potential medical applications for products made from SIS and other natural tissues are under development.

36.    All acts and omissions of Cook Biotech Incorporated as described herein were done by its agents, servants, employees, and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership. At all times material hereto, Cook Biotech Incorporated did business in all states of the United States of America.

37.    Cook Medical Incorporated is a corporation organized under the laws of Indiana, with a principal place of business at 1025 W. Acuff Road, Bloomington, Indiana 47402-4195.

38.    Defendant Cook Medical Incorporated alleges as follows: it was established to offer a synchronized service for the efficient purchase and distribution of all Cook medical devices. With particular focus on lowering supply chain costs, the company coordinates price file access, purchase orders, ship points and accounts payable.

39.    All acts and omissions of Cook Medical Incorporated as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective

agencies, services, employments and/or ownership. At all times material hereto, Cook Medical Incorporated did business in all states of the United States of America.

40.    Cook Incorporated, Cook Biotech Incorporated and Cook Medical Incorporated shall be herein referred to as the "Cook Defendants."

41.    Upon information and belief, the Cook Defendants individually or collectively make, use, offer for sale, sell in the United States and/or import into the United States products used to treat pelvic organ prolapse and stress urinary incontinence including the Surgisis Biodesign system, the Stratasis TF Tension-Free Urethral Sling Kit, or line of pelvic products and related delivery devices.

42.    All acts and omissions of each defendant as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

43.    The Cook Defendants share many of the same officers, directors, and operations; and maintain ownership in the assets and/or liabilities relating to the design, manufacture, marketing, distribution, and sale of the medical device line at issue in this litigation and shall be referenced collectively.

44.    At all times relevant herein, defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, and other pelvic mesh products unknown at the present .The Cook Defendants manufacture, market, advertise, promote and sell pelvic mesh products worldwide. As a result of the coordinated activities of the Cook Defendants, Plaintiff was implanted with defective pelvic floor repair products.

45.     The Cook Defendants had a legal duty to insure the safety and effectiveness of their pelvic mesh products by conducting adequate and well controlled studies on their products prior to marketing. The Cook Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients with false and misleading information about the safety and effectiveness of their pelvic mesh products. Furthermore, the Cook defendants made a conscious decision to forego performing studies and creating registries that would have provided doctors and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of their pelvic mesh products.

46.     Defendant, Johnson & Johnson ("J&J") is a corporation, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its worldwide headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. Johnson & Johnson organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its' pelvic floor repair products. Within J&J there are three sectors, medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by J&J with the design, development, promotion, marketing, testing, training, distribution and sale of the pelvic floor repair products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc., Ethicon LLC, Ethicon LTD.

47.    Defendant, Ethicon, Inc., is a wholly owned subsidiary of Defendant Johnson & Johnson located in Somerville, New Jersey.

48.    Defendant, Ethicon, LLC, is a wholly owned subsidiary of Johnson & Johnson Medical, Inc., located in San Lorenzo, Puerto Rico. Ethicon LLC was charged by J&J with the manufacture of Ethicon Inc.'s pelvic floor repair products.

49.    Collectively J&J, Ethicon, Inc. and  Ethicon LLC shall be herein referred to as the J&J Defendants.

50.    At all times relevant herein, the J&J Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the Prolene Mesh/Prolene Soft Mesh, Gynemesh, Gynemesh PS, TVT, TVT-Obturator (TVT-O), TVT-SECUR (TVT-S), TVT Exact, TVT Abbrevo, Prolift, Prolift +M, Prosima and other pelvic mesh products unknown at the present (hereinafter collectively referred as the "J&J Products").

51.    The J&J Defendants manufacture, market, advertise, promote and sell J&J Products worldwide. As a result of the coordinated activities of all J&J Defendants named above, Plaintiff was implanted with a defective pelvic floor repair product.

52.    The J&J Defendants had a legal duty to insure the safety and effectiveness of their pelvic mesh products by conducting adequate and well controlled studies on their products prior to marketing. The J&J Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients with false and misleading information about the safety and effectiveness of their pelvic mesh products. Furthermore, the J&J Defendants made a conscious decision to forego performing studies and creating registries that would have provided doctors and patients in the United States with

accurate information regarding the lack of proof of the safety and effectiveness of the J&J Products.

53.    Defendant Desarrollo e Investigación Médica Aragonesa, S.L. ("DIMA") is a corporation organized and existing under the laws of the Kingdom of Spain maintaining its principal place of business at Poligono Industrial Mediavega Parcela 2.9, Calatayud, Zaragoza, Kingdom of Spain 50300, making it a foreign citizen.

54.    Defendant Neomedic International, S.L. ("Neomedic International") is a corporation organized and existing under the laws of the Kingdom of Spain maintaining its principal place of business at C/Maestrat, 41-43 Terrassa, Barcelona, Spain 08225, making it a foreign citizen. Neomedic International is registered with the FDA as a foreign exporter and specification developer of the "Needleless Sling."

55.    Defendant Neomedic Inc. ("Neomedic") was a corporation organized and existing under the laws of Florida, with its principal place of business at 2655 Le Jeune Road, #810, Coral Gables, Florida, 33134, making it a citizen and resident of the State of Florida, at the time of the events giving rise to this cause of action. Defendant Neomedic Inc. was the United States headquarters of Neomedic International, S.L. at the time of the events giving rise to this cause of action.

56.    Defendant Specialties Remeex International, S.L. ("SRI") is a corporation organized and existing under the laws of the Kingdom of Spain maintaining its principal place of business at C/Tren De Baix, 55 Baixos Terrassa, Barcelona, Kingdom of Spain 308223, making it a foreign citizen. Defendant SRI is registered with the FDA as the owner/operator of Neomedic International.

57.     Collectively, DIMA, Neomedic International, Neomedic and SRI are herein after referred to as the Neomedic Defendants.

58.     At all times material to this action, the Neomedic Defendants have designed, patented, manufactured, packaged, labeled, marketed, sold, and distributed a line of pelvic mesh products, which are delineated below. These products were designed primarily for the purposes of treating stress urinary incontinence and pelvic organ prolapse. Each of these products was cleared for sale in the United States after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy. One or more of the NeomedicDefendants' pelvic mesh products were implanted in Plaintiff .

59.     The products include those known as Contasure Needleless Sling System, Needleless Sling System, Remeex System/TRT Remeex System, KIM System, Uplift, and Surelift, as well as any variations of these products and any unnamed Neomedic pelvic mesh product designed and sold for similar purposes, inclusive of the instruments and procedures for implementation.

**<u>VENUE</u>**

60.     Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. §1332(a), in that in each of the constituent actions there is complete diversity among Plaintiff and Defendants and the amount in controversy exceeds $75,000.

61.     Defendants have significant contacts with the federal judicial district identified in the Complaint such that they are subject to the personal jurisdiction of the District Colorado for the District of Colorado.

62.     A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the District of Colorado.

63.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

## FACTUAL BACKGROUND

64.     Defendants' Products contain monofilament polypropylene mesh and/or collagen. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in the Plaintiff set forth in this Complaint is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with Defendants' Products.  This negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.

65.     Furthermore, Defendants' collagen products cause hyper-inflammatory responses leading to problems including chronic pain and fibroticreaction. Defendants' collagen products disintegrate after implantation in the female pelvis. The collagen products cause adverse tissue reactions, and are causally related to infection, as the collagen is a foreign material derived from animal tissue. Animal collagen is harsh upon the female pelvic tissue. It hardens in the body. When mesh is inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

66.     Defendants sought and obtained FDA clearance to market the Products under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to

other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the Products.

67.    On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 reports of complications (otherwise known as "adverse events") that had been reported over a three year period relating to pelvic mesh products. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the Defendant is one of the manufacturers of the products that are the subject of the notification. In 2008, the FDA described the complications associated with pelvic mesh products as "**rare**."

68.    On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**" (emphasis in the original).

69.    The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a *previously unidentified risk* of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

70. The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks.

71.    Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

72.    Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

73.    The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (Emphasis in original).

74.    The FDA White Paper further stated that "these products are associated with serious adverse events . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

75.    In its White Paper, the FDA advises doctors to, *inter alia*, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications."

76.    The FDA concludes its White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic org an prolapse.

77.    At the time Defendants began marketing each of its Products, Defendants were aware that its Pelvic Mesh Products were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011 Safety Communication.

78.    The information contained in the FDA's Public Health Notification of October 2008 and

the FDA Safety Communication of July 13, 2011 was known or knowable to Defendants and was not disclosed in oral or written communications, direct to consumer advertising in the form of patient brochures, instructions of use or labeling.

79.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

80.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

81.     The injuries of Plaintiff as will be more fully set forth in the Plaintiff's Fact Sheet to be served in this civil action are reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

82.     Defendants knew or should have known about the Products' risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

83.     Defendants knew or should have known that the Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

84.     The scientific evidence shows that the material from which Defendants' Products are made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Products.

85.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by the Plaintiff.

86.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Products were unreasonably susceptible to degradation and fragmentation inside the body.

87.     The Products were unreasonably susceptible to shrinkage and contraction inside the body.

88.     The Products were unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

89.     The Products have been and continue to be marketed to the medical community and to patients as safe, effective, reliable, medical devices, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of pelvic organ prolapse and stress urinary incontinence, and other competing products.

90.     Defendants omitted the risks, dangers, defects, and disadvantages of the Products, and advertised, promoted, marketed, sold and distributed the Products as safe medical devices when Defendants knew or should have known that the Products were not safe for their intended purposes, and that the Products would cause, and did cause, serious medical problems, and in some patients, including the Plaintiff, catastrophic injuries.

91.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Products have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the  Plaintiff , making them defective under the law.

92.     The specific nature of the Products' defects includes, but is not limited to, the following:

    a.    the use of polypropylene and collagen material in the Products and the immune reactions that result from such material, causing adverse reactions and injuries;

    b.    the design of the Products to be inserted transvaginally, into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    c.    biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

    d.    the use and design of arms and anchors in the Products, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

    e.    the propensity of the Products for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

    f.    the inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking); and

    g.    the propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

    h.    the hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

i.      the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j.      the adverse tissue reactions caused by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

k.      the harshness of animal collagen upon the female pelvic tissue, and the hardening of the product in the body;

l.      the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions;

m.      the procedure itself, which is part of Defendants' Pelvic Mesh Products, requires the physician to insert the device "blindly" resulting in nerve damage and damage to other internal organs;

n.      the design of trocars, as devices which as part of Defendants' Pelvic Mesh Products and which are used to insert the Pelvic Mesh Products into the vagina, are defective because the device requires tissue penetration in nerve rich environments which results frequently in the destruction of nerve endings causing pain and other injuries.

93.    The Products are also defective due to Defendants' failure to adequately warn or instruct the Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

a.      the Products' propensities to contract, retract, and/or shrink inside the body;

b.       the Products' propensities for degradation, fragmentation and/or creep;

c.      the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.      the rate and manner of mesh erosion or extrusion;

e.      the risk of chronic inflammation resulting from the Products;

f.      the risk of chronic infections resulting from the Products;

g.      the risk of permanent vaginal or pelvic scarring as a result of the Products;

    h.     the risk of permanent vaginal shortening resulting from the Products;

    i.     the risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

    j.     the need for corrective or revision surgery to adjust or remove the Products;

    k.     the severity of complications that could arise as a result of implantation of the Products;

    l.     the hazards associated with the Products;

    m.     the Products' defects described herein;

    n.     treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

    n.     treatment of pelvic organ prolapse and stress urinary incontinence with the Products exposes patients to greater risk than feasible available alternatives;

    o.     treatment of pelvic organ prolapse and stress urinary incontinence with the Products makes future surgical repair more difficult than feasible available alternatives;

    p.     use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

    q.     removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

    r.     complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain.

94.    Defendants have underreported information about the propensity of the Products to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Products through various means and media. Defendants have also underreported information about the injuries caused by the use of the implantation kits and surgical technique instructions that accompany their pelvic meshes.

95.    Defendants failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Products.

96.    Defendants failed to design and establish a safe, effective procedure for removal of the Products, or to determine if a safe, effective procedure for removal of the Products exists.

97.    Feasible and suitable alternatives to the Products have existed at all times relevant that do not present the same frequency or severity of risks as do the Products.

98.    The Products were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, provided the surgical kits for implantation, and provided training for the implanting physician.

99.    Defendants provided incomplete and insufficient training and information to physicians regarding the use of the Products and the aftercare of patients implanted with the Products.

100.    The Product or Products implanted in Plaintiff  were in the same or substantially similar condition as they were when they left Defendants' possession, and in the condition directed by and expected by Defendants.

101.    Plaintiff was forced to undergo an extensive revision on November 19, 2013 to locate and remove mesh because it was holding her bladder in the wrong position and causing extreme pain which continues to this day.

102.    The medical and scientific literature studying the effects of Defendants' mesh products, like that of the Product(s) implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Products.

103.    Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

104.    At all relevant times herein, Defendants continued to promote the Products as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy.

105.    In doing so, Defendants failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Products.

106.    At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff and the general public on notice of the dangers and adverse effects caused by implantation of the Products.

107.    The Products as designed, manufactured, distributed, sold and/or supplied by Defendants were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

108. As a result of having the Products implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

109.    Paragraphs 1-108 of this Complaint are hereby incorporated by reference as if fully set forth herein.

110.    Defendants had a duty to Plaintiff to use reasonable care in designing, manufacturing, marketing, labeling, packaging and selling the Products.

111.    Defendants were negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the Products. Defendants breached their aforementioned duty by:

  a.    Failing to design the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

  b.    Failing to manufacture the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

  c.    Failing to use reasonable care in the testing of the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

  d.    Failing to use reasonable care in inspecting the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

  e.    Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Products.

112.    The reasons that Defendants' negligence caused the Products to be unreasonably dangerous and defective include, but are not limited to:

  a.    the use of polypropylene material and/or collagen material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

  b.    the design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

  c.    biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

  d.    the use and design of arms and anchors in the Products, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

  e.    the propensity of the Products for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

      f.     the inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation); and

      g.     the propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

      h.     the hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

      i.     the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

      j.     the adverse tissue reactions caused by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

      k.     the harshness of animal collagen upon the female pelvic tissue, and the hardening of the product in the body;

      k.     the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

113.    Defendants also negligently failed to warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

      a.     the Products' propensities to contract, retract, and/or shrink inside the body;

      b.     the Products' propensities for degradation, fragmentation and/or creep;

      c.     the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

      d.     the rate and manner of mesh erosion or extrusion;

      e.     The risk of chronic inflammation resulting from the Products;

      f.     the risk of chronic infections resulting from the Products;

      g.     the risk of permanent vaginal or pelvic scarring as a result of the Products;

h.      the risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

i.      the need for corrective or revision surgery to adjust or remove the Products;

j.      the severity of complications that could arise as a result of implantation of the Products;

k.      the hazards associated with the Products;

l.      the Products' defects described herein;

m.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

n.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products exposes patients to greater risk than feasible available alternatives;

o.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products makes future surgical repair more difficult than feasible available alternatives;

p.      use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.      removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.      complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain.

114.    As a direct and proximate result of Defendants' negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

115.    Plaintiff incorporates by reference paragraphs 1-114 of this Complaint as if fully set forth herein.

116.    The Products implanted in the Plaintiff  were not reasonably safe for their intended uses and were defective as described herein with respect to their design. As previously stated, the Products' design defects include, but are not limited to:

    a.    the use of polypropylene material and/or collagen material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

    b.    the design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    c.    biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

    d.    the use and design of arms and anchors in the Products, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

    e.    the propensity of the Products for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

    f.    the inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation); and

    g.    the propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

    h.    the hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction;

    i.    the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j.      the adverse tissue reactions caused by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

k.      the harshness of animal collagen upon the female pelvic tissue, and the hardening of the product in the body;

l.      the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

117.    As a direct and proximate result of the Products' aforementioned defects as described herein, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo future medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

118.    Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling defective product(s).

## COUNT III: STRICT LIABILITY – MANUFACTURING DEFECT

119.    Plaintiff incorporates by reference paragraphs 1-118 of this Complaint as if fully set forth herein.

120.    The Product(s) implanted in Plaintiff were not reasonably safe for their intended uses and were defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to the Plaintiff.

121.    As a direct and proximate result of the Products' aforementioned defects as described herein, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and/or corrective surgery and

hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

122.    Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling defective product(s).

## COUNT IV: STRICT LIABILITY – FAILURE TO WARN

123.    Plaintiff incorporates by reference paragraphs 1-122 of this Complaint as if fully set forth herein.

124.    The Product(s) implanted in the Plaintiff were not reasonably safe for their intended uses and were defective as described herein as a matter of law due to their lack of appropriate and necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

    a.    the Products' propensities to contract, retract, and/or shrink inside the body;

    b.    the Products' propensities for degradation, fragmentation, disintegration and/or creep;

    c.    the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

    d.    the rate and manner of mesh erosion or extrusion;

    e.    the risk of chronic inflammation resulting from the Products;

    f.    the risk of chronic infections resulting from the Products;

    g.    the risk of permanent vaginal or pelvic scarring as a result of the Products;

    h.    the risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

    i.    the need for corrective or revision surgery to adjust or remove the Products;

    j.    the severity of complications that could arise as a result of implantation of the Products;

k.      the hazards associated with the Products;

l.      the Products' defects described herein;

m.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

n.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products exposes patients to greater risk than feasible available alternatives;

o.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products makes future surgical repair more difficult than feasible available alternatives;

p.      use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.      removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.      complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain.

125.    As a direct and proximate result of the Products' aforementioned defects as described herein, the Plaintiff  has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

126.    Defendant is strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product(s).

## COUNT V: STRICT LIABILITY – DEFECTIVE PRODUCT

127.    Plaintiff incorporates by reference paragraphs 1-126 of this Complaint as if fully set forth herein.

128.    At the time of Plaintiff's injuries, the Defendants' Products were defective and unreasonably dangerous to foreseeable consumers, patients, and users, including Plaintiff, and the warnings labels, and instructions were deficient.

129.    The Defendants'  Products are dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their health care providers.

130    Plaintiff asserts each of these claims against Defendants.

131.    As a proximate result of the Defendants' design, manufacture, marketing, sale, and distribution of the Products, Plaintiff has been catastrophically injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

## COUNT VI: BREACH OF EXPRESS WARRANTY

132.    Plaintiff incorporates by reference paragraphs 1-131 of this Complaint as if fully set forth herein.

134.    Defendants made assurances as described herein to the general public, hospitals and health care professionals that the Products were safe and reasonably fit for their intended purposes.

135.    The Plaintiff  and/or her healthcare provider chose the Products based upon Defendants' warranties and representations as described herein regarding the safety and fitness of the Products.

136.    The Plaintiff named in the Complaint, individually and/or by and through her physician, reasonably relied upon Defendants' express warranties and guarantees that the Products were safe, merchantable, and reasonably fit for their intended purposes.

137.    Defendants breached these express warranties because the Product(s) implanted in Plaintiff were unreasonably dangerous and defective as described herein and not as Defendants had represented.

138.    Defendants' breach of their express warranties resulted in the implantation of an unreasonably dangerous and defective product(s) in the body of the Plaintiff, placing said Plaintiff's health and safety in jeopardy

139.    As a direct and proximate result of Defendants' breach of the aforementioned express warranties, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VII: BREACH OF IMPLIED WARRANTY

140.    Plaintiff incorporates by reference paragraphs 1-139 of this Complaint as if fully set forth herein.

141.    Defendants impliedly warranted that the Products were merchantable and were fit for the ordinary purposes for which they were intended.

142.    When the Products were implanted in the Plaintiff to treat her stress urinary incontinence, the Products were being used for the ordinary purposes for which they were intended.

143.    The Plaintiff individually and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the Products implanted in her.

144.    Defendants breached these implied warranties of merchantability because the Product(s) implanted in the Plaintiff were neither merchantable nor suited for their intended uses as warranted.

145.    Defendants' breach of their implied warranties resulted in the implantation of unreasonably dangerous and defective products in the body of Plaintiff placing Plaintiff's health and safety in jeopardy.

146.    As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VIII: FRAUDULENT CONCEALMENT

147.    Plaintiff incorporates by reference paragraphs 1-146 of this Complaint as if fully set forth herein.

148.    On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 reports of complications (otherwise known as "adverse events") that had been reported over a three year period relating to pelvic mesh products. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the Defendant is one of the manufacturers of the products that are the subject of the notification. In 2008, the FDA described the complications associated with pelvic mesh products as "rare."

149.    The FDA further stated that "specific characteristics of patients at increased risk for complications have not been determined." As a result, the FDA recommended, among other things, Doctors "[o]btain specialized training for each mesh placement technique, and be aware of its risks."

150.    Despite the FDA's statement that complications caused by the mesh were "rare", the Defendants knew at all times material to these actions that complications were, in fact not rare. Furthermore, the Defendants knew at all relevant times that the FDA's focus on training and surgical technique of the implanting physicians was misguided.

151.    At all times prior to the October 20, 2008 Public Health Notification to the present, it was known or knowable to Defendants that their pelvic mesh products caused large numbers of complications that were not rare. Moreover, it was known or knowable to Defendants that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with these devices. It was known or knowable to Defendants that the safety and efficacy of their Products had not been proven with respect to, among other things, the Products, their components, their performance and their method of insertion. It was known or knowable to Defendants that there was not evidence that their Products were safe and effective and, in fact the evidence that was known or knowable to Defendants was that Products were not safe and effective. Defendants continued to represent that their Products were safe and effective.

152.    Despite what was known or knowable to Defendants about the lack of safety and efficacy of their Products prior to 2008, Defendants failed to disclose this information to the Plaintiff, to her physicians or to the public at large.

153.    Despite this knowledge, Defendants continued to market and sell their Products and procedures as being safe and efficacious with evidence to the contrary.  Additionally, Defendants wrongfully and intentionally, through their physician training program, provided physicians with the comfort that they had sufficient training, consistent with the 2008 FDA PHN, to minimize or eliminate adverse effects resulting from the devices.

154.    At all times mentioned herein, Defendants, and each of them, had the duty and obligation

to disclose to Plaintiff and to her physicians, the true facts concerning the aforesaid products, that is, that said products were dangerous and defective, lacking efficacy for its purported use and lacking safety in normal use, and how likely it was to cause serious consequences to users including permanent and debilitating injuries. Defendant concealed these material facts prior to the time that Plaintiff was implanted with Defendants' Products.

155.    Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of the Products because:

      a)    Defendants were in a superior position to know the true quality, safety and efficacy of the Defendants' Products;

      b)    Defendants knowingly made false claims about the safety and quality of the Defendants' Products in the documents and marketing materials Defendants provided to the FDA, physicians, and the general public; and

      c)    Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' Products from Plaintiff.

156.    The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' Pe Products.

157.    At all times herein mentioned, Defendants, and each of them, willfully, intentionally, and maliciously concealed facts as set forth above from Plaintiff and her physicians, and therefore, Plaintiff, with the intent to defraud as herein alleged.

158.    Defendants intentionally concealed and/or failed to disclose the true defective nature of the Products so that Plaintiff would request and purchase the Defendants' Products, and that her healthcare providers would dispense, prescribe, and recommend the Defendants' Products, and Plaintiff justifiably acted or relied upon, to her detriment, the concealed and/or non-disclosed facts as evidenced by her purchase of the Defendants' Products.

159.    At all times herein mentioned, neither Plaintiff nor her physicians were aware of the facts set forth above, and had they been aware of said facts, they would not have acted as they did, that is, would not reasonably relied upon said representations of safety and efficacy and utilized the AMS' pelvic mesh products for treatment of stress urinary incontinence and pelvic organ prolapse. Defendants' failure to disclose this information was a substantial factor in Plaintiff's physicians selecting Defendant(s)Products and procedures for treatment of stress urinary incontinence and pelvic organ prolapse. This failure to disclose also resulted in the provision of incorrect and incomplete information to the Plaintiff.

160.    As a direct and proximate result of this conduct, Plaintiff was injured.

## COUNT IX: CONSTRUCTIVE FRAUD

161.    Plaintiff incorporates by reference paragraphs 1-160 of this Complaint as if fully set forth herein.

162.    Defendants are in a unique position of knowledge concerning the quality, safety and efficacy of the Defendants' Products, which knowledge is not possessed by Plaintiff or her physicians, and Defendants thereby hold a position of superiority over Plaintiff and her physicians.

163.    Despite their unique and superior knowledge regarding the defective nature of the Defendants' Products, Defendants continue to suppress, conceal, omit, and/or misrepresent information to Plaintiff, the medical community, and/or the FDA, concerning the severity of risks and the dangers inherent in the intended use of the Defendants' Products, as compared to other products and forms of treatment.

164.    For example, scientists in the recent study published in Obstetrics & Gynecology, August, 2010, found that the complication rate was so high that the clinical trial was halted early.

165.    Defendants have concealed and suppressed material information, including limited clinical testing, that would reveal that the Defendants' Products had a higher risk of adverse effects, in addition to, and exceeding those associated with alternative procedures and available devices. Instead, Defendants have misrepresented the safety and efficacy of the Products.

166.    Upon information and belief, Defendants' misrepresentations are designed to induce physicians and Plaintiff to prescribe, dispense, recommend and/or purchase the Defendants' Products. Plaintiff and the medical community have relied upon Defendants' representations.

167.    Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and her medical providers and engaged in constructive fraud in their relationship with Plaintiff and their medical providers. Plaintiff reasonably relied on Defendants' representations.

168.    As a proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic damages, and death.

## COUNT X: DISCOVERY RULE, TOLLING AND FRAUDULENT CONCEALMENT

169.    Plaintiff incorporate by reference paragraphs 1-168 of this Complaint as if fully set forth herein.

170.    Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

171.    Plaintiff pleads that the discovery rule should be applied to toll the running of the statute

of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

172.    Despite diligent investigation by Plaintiff into the cause of their injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages, and their relationship to the Products was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

173.    The running of the statute of limitations in this cause is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with the Products. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

## COUNT XI: NEGLIGENT MISREPRESENTATION

174.    Plaintiff incorporates by reference paragraphs 1-173 of this Complaint as if fully set forth herein.

175.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare

community, Plaintiff, and the public, that the Products had not been adequately tested and found to be safe and effective for the treatment of incontinence and prolapse. The representations made by Defendants, in fact, were false.

176.    Defendants failed to exercise ordinary care in the representations concerning the Products while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Products' high risk of unreasonable, dangerous, adverse side effects.

177.    Defendants breached their duty in representing that the Defendants' Products have no serious side effects different from older generations of similar products and/or procedures to Plaintiff, Plaintiff's physicians, and the medical and healthcare community.

178.    As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, erosion, pain and suffering, surgery to remove the products, and other severe and personal injuries, which are permanent and lasting in nature.

179.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic damages, and death.

### **COUNT XII : NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

180.    Plaintiff incorporates by reference paragraphs 1-179 of this  Complaint as if fully set forth herein.

181.    Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Defendants' Products to Plaintiff, carelessly and negligently concealing the harmful effects of the Defendants' Products from Plaintiff, and carelessly and negligently misrepresented the quality, safety and efficacy of the Products.

182.    Plaintiff was directly impacted by Defendants' carelessness and negligence, in that Plaintiff has sustained and will continue to sustain emotional distress, severe physical injuries and/or death, economic losses, and other damages as a direct result of being implanted with the Products sold and distributed by Defendants and/or because of the nature of their relationship to the individual implanted with the Products.

183.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

## COUNT XIII: GROSS NEGLIGENCE

184.    Plaintiff incorporates by reference paragraphs 1-183 of this Complaint as if fully set forth herein.

185.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law would allow, and which Plaintiff will seek exemplary damages  in that Defendants' conduct, including the failure to comply with applicable federal standards: was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or

welfare of others; or included a material representation that was false, with Defendants, knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

186.    Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

187.    Plaintiff therefore will seek to assert claims for exemplary damages at the appropriate time under Colorado law in an amount within the jurisdictional limits of the Court.

188.    Plaintiff also allege that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiff. In that regard, Plaintiff will seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

## COUNT XIV: UNJUST ENRICHMENT

189.    Plaintiff incorporate by reference paragraphs 1-188 of this Complaint as if fully set forth herein Defendants are and at all times relevant were the manufacturers, sellers, and/or suppliers of the Defendants' Products.

190.    Plaintiff paid for the Defendants' Products for the purpose of treatment of stress urinary incontinence .

191.    Defendants have accepted payment by Plaintiff and others on Plaintiff's behalf for the purchase of the Defendants' Products.

192.    Plaintiff has not received the safe and effective medical devices for which they paid.

193.    It would be inequitable for Defendants to keep this money since Plaintiff did not in fact receive a safe and effective medical device as represented by Defendants.

## COUNT XV: PUNITIVE DAMAGES

194.    Plaintiff incorporates by reference paragraphs 1-193 of this Complaint as if fully set forth herein.

195.    Defendants sold their Products to the Healthcare providers of the Plaintiff and other providers state of Colorado and throughout the United States without doing adequate testing to ensure that the Products were reasonably safe for implantation in the female pelvic area.

196.    Defendants sold the Products to the Plaintiff 's health care providers and other health care providers in the state of Colorado and throughout the United States in spite of their knowledge that the Products can  shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by the Plaintiff.

197.    Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the Products' failures to perform as intended, which lead to the severe and debilitating injuries suffered by the Plaintiff. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Products' designs or the processes by which the Products are manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the Products as safe and effective.

198.    Defendants knew the Products were unreasonably dangerous in light of their risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Products, as well as other severe and personal injuries which were permanent and lasting in nature.

199.    Defendants withheld material information from the medical community and the public in general, including the Plaintiff, regarding the safety and efficacy of the Products.

200.    Defendants knew and recklessly disregarded the fact that the Products caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat pelvic organ prolapse and stress urinary incontinence.

201.    Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Products.

202.    Notwithstanding the foregoing, Defendants continue to aggressively market the Products to consumers, without disclosing the true risks associated with the Products.

203.    Defendants knew of the Products' defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the Products so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff.

204.    Defendants continue to conceal and/or fail to disclose to the public, including the Plaintiff, the serious complications associated with the use of the Products to ensure continued and increased sales of the Products.

205.    Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

1. Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

2. Restitution and disgorgement of profits;

3. Reasonable attorneys' fees;

4. The costs of these proceedings;

5. All ascertainable economic damages;

6. Punitive damages;

7. Survival damages (if applicable);

8. Wrongful death damages (if applicable); and

9. Such other and further relief as this Court deems just and proper.

Dated: February 4, 2017

/s/ J. Christopher Elliott
**Darin L. Schanker**
**J. Kyle Bachus**
**J. Christopher Elliott**
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone: (303) 893-9800
FAX: (303) 893-9900
E-mail: dschanker@coloradolaw.net
E-mail: kyle.bachus@coloardolaw.net
Email: celliott@coloradolaw.net
Attorneys for Plaintiff